JOHN DEERK, JR., ET AL., APPELLEES, V. M. L. BABCOCK ET AL.: DEUEL COUNTY STATE BANK, APPELLANT.

FILED JULY 17, 1930. No. 27237.

L. O. Pfeiffer, C. C. Flansburg, L. A. Flansburg and George A. Lee, for appellant.

Claude Golding, contra.

Heard before GOSS, C. J., ROSE, GOOD, EBERLY and DAY, JJ., and JAMES and WRIGHT, District Judges.

WRIGHT, District Judge.

John Deerk and his two sons, Albert and John, Jr., brought this action to rescind a contract of purchase of a Colorado school land lease, and to have canceled notes aggregating $6,500, representing a part of the purchase price, and the mortgage given to secure the same. The action was brought against M. L. Babcock, who owned the lease, Thomas A. Smith, who acted as agent for Babcock, J. T. DoRan, who assisted in negotiating the sale, and Deuel County State Bank, which purchased and held the notes

and mortgage in question. Babcock was not brought within the jurisdiction of the court; the defendants Smith and DoRan were dismissed out of the case; and decree was entered against the bank, which claimed to be a holder in due course.

Plaintiffs allege that they were induced, through fraud of Babcock and his agents, to purchase the lease for $7,000, and for which they gave their check for $500, seven notes, six for $1,000 each, and one for $500, secured by a mortgage, and which notes and mortgage the bank purchased and held, with knowledge of the fraud. The prayer of the petition was that the contract be rescinded and the notes and mortgage be canceled. The bank answered, alleging that it purchased the notes and mortgage in due course, without any notice of existing defenses or defects in the title; and that afterwards the plaintiffs willingly executed new notes in substitution thereof. It further alleged that, before it purchased the notes and mortgage, one of its officers, its president, made inquiry of plaintiffs and were by them informed that it would be satisfactory for the bank to purchase the same and it thereupon made such purchase. It alleges that the plaintiffs, having affirmed said notes, were estopped from denying their validity in its hands. Plaintiffs, by reply, denied that the bank was holder in due course, and alleged that it bought with knowledge of the fraudulent representation and fraudulent circumstances under which they were obtained from plaintiffs.

Upon the trial of the issues, the district court found in favor of the plaintiffs, that the bank was not a holder in due course, that it purchased under such conditions as to prevent it from being a holder in due course, and entered a decree canceling the notes and the mortgage securing the same. From this decree the bank has appealed.

The evidence establishes that John Deerk, Sr., and his two sons, herein referred to as plaintiffs, are farmers who have had practically no education and apparently very limited experience outside their particular line of work. M. L. Babcock, who held the school land lease for 640 acres

of land, issued by the state of Colorado, listed the same for sale with Thomas A. Smith, at a price of $3,500. Smith called to assist him J. T. DoRan, a veterinarian, living in the town of Chappell, Nebraska. DoRan brought about an arrangement whereby the Deerks met him, with Babcock and Smith, in Chappell, on November 22, 1928. They went to the land, where plaintiffs made a partial examination of the same. Plaintiffs were then taken to an office in Julesburg, Colorado, where an agreement was reached whereby the Deerks, father and sons, purchased and agreed to pay for this lease the sum of $7,000. As a part of the purchase price, they gave their check for $500, and the balance was represented by seven notes, six for $1,000 each, and one for $500, each due September 1, 1929, with interest at the rate of 4 per cent. per annum. The lease was assigned and delivered to the Deerks at that time. The following Sunday, November 25, the Deerks again went onto and examined the land.

Babcock undertook to sell the notes and, having first offered them to a competitor bank in Chappell, also a bank in Sidney, Nebraska, then offered them to the defendant bank, who, through its cashier, refused to purchase. It was later suggested to Murphy, the president of the bank, that he might arrange to trade securities for a part of the purchase price of the notes, and an agreement was finally reached whereby Murphy, for the bank, purchased the notes aggregating $6,500 at a discount of $1,000, paying therefor $500 in cash, a mortgage on 320 acres of land in eastern Colorado for $1,500, to which the bank examiner was making objections, and upon which the interest was in default, and the balance, $3,500, in nonnegotiable certificates of deposit issued by the bank, due the following September. Before the deal was closed with the bank, Babcock, Smith, DoRan and Murphy, on Monday, November 26, went to plaintiffs' place and there saw the older Deerk and his son Albert. There is conflict in the testimony as to just what was there said between the parties. Babcock, Murphy, Smith and DoRan claim that the elder Deerk, upon being informed that Murphy was considering the pur-

·chase of the notes, answered that he would rather Murphy had them than any one else; that he had seen the land and was satisfied with the deal, and gave no information of any facts which could put Murphy upon inquiry, but consented that he should purchase them. The elder Deerk's account of the interview is somewhat different. He says that Murphy and the others came to his place, and "they wanted to buy these notes; they made another agreement to buy them, and they asked me if it was all right with me, and I told them 'We always done business, be all right with me, but it wasn't nothing in my line of business; it is the boys for it.'" On cross-examination he also said: "I told him it was all right with me on account I been doing my business with that bank since it started, and I says, 'I ain't got nothing to do with it; it is for the boys.'" He further said: "Babcock leaned past me and said the land was ours. I told him I didn't think so; looked to me like there was something wrong." He denies telling Murphy that he had examined the land and that he was satisfied with the deal.

Albert Deerk, who was there present, says that Murphy told him he was going to buy the notes and asked if it was all right with them, when he said: "I don't know; I wouldn't say you should buy them until you see my brother." He denies that any statement was made as to their having visited the land or being satisfied with the deal.

John Deerk, Jr., the brother to whom Albert refers, testified that on being informed that Murphy wanted to see him he went to the bank, when Murphy said: "I want to buy those notes; I seen your father and your brother and they said it was up to you." He then says: "I told him it was all right, but he should look everything over and see whether everything was all right."

Immediately after the trade was consummated in Julesburg, the Deerks took their lease home, where it was read over to them by their sister, who was better able to read than they. It is evident that they soon became suspicious of the deal. The Deerks say it was represented to them as one of the inducements to trade that, under the lease,

the state of Colorado agreed to pay $1.50 an acre each time the land was plowed; and that there was a credit with the state of Colorado for improvements to the amount of $6,600, which must be paid by any person taking the lease from them. They produced the paper upon which DoRan had written: "Improvement credit at State 6,600," and "yearly rental to state $403.70." We are satisfied these statements were made to the plaintiffs.

Counsel for the bank insist that the plaintiffs are entitled to no relief in this action because there was no testimony as to the actual value of this school lease. While it is true no direct testimony was offered on that matter, it does appear from the record that Babcock was selling it for $3,500 and that the representations as to the price to be paid for plowing and the $6,600 credit were false. We are satisfied that the evidence justifies a finding that the plaintiffs were induced to buy through fraud.

This, then, leaves the question as to whether the bank took the notes in question in good faith, for value, and without notice of any defect in the title of the person negotiating the same.

It seems that Murphy, for the bank, was not willing to rely upon the apparent regularity of the notes, but insisted upon making an independent investigation, going to the makers and requesting their consent that he purchase. The Deerks, while they entertained suspicions as to their purchase, were evidently ignorant of the steps necessary to be taken for their protection. The father, while he stated "it would be all right with him," finally left it to the boys to determine. Albert refused to give his consent but left it to the brother John, who, according to his testimony, gave his consent conditioned, however, that the bank should "see whether everything was all right." This was immediately after John, Jr., had been to DoRan asking for an explanation, saying the lease did not seem to read right, and had been by DoRan assured that it was all right and they should take the lease and farm the land. Murphy has no recollection of this statement of John, but does say that he looked entirely to the elder Deerk.

It is apparent that at this time the Deerks were without full knowledge of the character of the fraud that had been perpetrated upon them. It is quite evident that had Murphy, at the time he first interviewed these plaintiffs, made even a casual inquiry, he would have discovered the fraud, as he did, in fact, the day after. The next day, when the Deerks came to the bank, at Murphy's request, to execute new notes in substitution for those he had taken, he discovered through inquiry facts which caused him to advise plaintiffs to stop payment of the $500 check which they had given on the purchase price. As soon as he learned of the representation that the state would pay $1.50 for plowing, he expressed doubt, asked to see the lease, and advised steps toward rescission of the contract, which he carried out by notifying the bank upon which the check was drawn to stop its payment.

The elder Deerk had been a patron of the bank. The president, Murphy, had a high regard for his honesty, ability and frugality; he had theretofore owed the bank a fairly large amount and paid it satisfactorily. The president states that he understood the boys were "pretty good farmers and got quite a lot of machinery that is clear," the testimony was $15,000 to $20,000 worth. The bank purchased with knowledge that the notes were given for the lease in question, and with confidence in the honesty and ability of the makers, took them under an arrangement which amounted practically to an exchange of securities, paying but $500 in money, a questioned mortgage and nonnegotiable certificates of deposit. Counsel for the bank err in stating that the testimony does not disclose these certificates of deposit to have been nonnegotiable. It is hardly possible that Murphy, in the banking business in the western part of the state, was not aware of the exorbitant price the plaintiffs had agreed to pay for the school lease; and the mere fact that the holder of notes, made by persons in whose honesty, integrity and frugality the bank had confidence, was willing to part with them for the consideration in this case by the bank paid would ordinarily raise a ques-

tion as to their inception, and bears upon the question of good faith.

At the outset, it seems apparent, so far as the purchase price paid by the bank is represented by its certificates of deposit in the sum of $3,500, it cannot be held to be a holder in due course. These certificates were issued November 26, 1928, payable the following September, and, as stated by the bank's witness Babcock, were nonnegotiable. The next day after the bank took the notes its president learned from the plaintiffs such facts as caused him to advise them to stop payment on their check given as part of the purchase price for the lease. January 3, 1929, the bank was notified in writing by the attorney for the plaintiffs that they would refuse to pay the notes, and "that unless they receive back their notes and mortgage in the next ten days they will start legal action for their recovery." The certificates of deposit had not then been paid, and, in fact, were not paid until the following March, and then only by the conveyance of lands as to the value of which there is no proof.

It is expressly provided by our negotiable instruments law:

"Where the transferee receives notice of any infirmity in the instrument or defect in the title of the person negotiating the same before he has paid the full amount agreed to be paid therefor, he will be deemed a holder in due course only to the extent of the amount theretofore paid by him." Comp. St. 1922, sec. 4665.

And foreclosing all question on the proposition, this court, in *Minatare Bank v. Wilson*, 112 Neb. 216, said:

"We regard it as a well-settled proposition that, where a bank purchases a note and payment is not made therefor except by the giving of credit on the bank's books, or the issuance, as in this case, of a nonnegotiable certificate of deposit maturing at a later date, the purchasing bank does not become entitled to protection as a *bona fide* holder so long as no part of the deposit is drawn out or the certificate has not been paid or become an absolute outstanding liability of the bank. As long as the amount to be paid re-

mained in such condition, the bank, if it received notice of the fraud, was still in position to return the note and cancel the credit."

The rule is again recognized and announced in *Howells State Bank v. Hekrdle*, 113 Neb. 561. It seems clear that the bank, in the present case, is in no condition to claim as an innocent holder so far as the purchase price is represented by its nonnegotiable certificates of deposit. Our statute provides:

"Every holder is deemed *prima facie* to be a holder in due course, but when it is shown that the title of any person who has negotiated the instrument was defective, the burden is on the holder to prove that he or some person under whom he claims acquired the title as a holder in due course." Comp. St. 1922, sec. 4670.

And also provides:

"The title of a person who negotiates an instrument is defective within the meaning of this chapter when he obtained the instrument, or any signature thereto, by fraud." Comp. St. 1922, sec. 4666.

The evidence establishes that the notes in this case were obtained by fraud, and therefore the title was defective when they were negotiated to the bank. Under these circumstances, the burden is upon the bank to prove that it took the notes in good faith, in ordinary course of business, without notice of any defense thereto or defect of title in the holder. It has long been the accepted rule in this state that:

"Where fraud in the inception of a note is pleaded as a defense and supported by proof, in an action by an indorsee against the maker, the burden is on plaintiff to show he is a *bona fide* holder." *Central Nat. Bank v. Ericson*, 92 Neb. 396.

See *Wyman v. Searle*, 88 Neb. 26; *Kelman v. Calhoun*, 43 Neb. 157; *Haggland v. Stuart*, 29 Neb. 69; *Stephenson v. Perry*, 112 Neb. 294; *Howells State Bank v. Hekrdle*, 113 Neb. 561; *Union Nat. Bank v. Moomaw*, 106 Neb. 388. And the reason for the rule applies in this case, where the maker seeks affirmative relief against the claim of an indorsee; and it falls fairly within the statutory provision.

The holder of negotiable paper in due course, without knowledge of facts which impeach its validity between the antecedent parties, holds it by good title; but if it be shown that the holder took it under such circumstances as show bad faith or want of honesty on his part, whether proved by direct or circumstantial evidence, then the holder of such paper so taken is subject to existing defenses between the antecedent parties. *Dobbins v. Oberman,* 17 Neb. 163; *Myers v. Bealer,* 30 Neb. 280. The testimony presents the question as to whether the bank took with knowledge of such facts and circumstances as show want of honesty or indicate bad faith on its part. This court, in *First State Bank of Pleasant Dale v. Borchers,* 83 Neb. 530, said:

"To constitute bad faith, the buyer must have had knowledge of infirmities in the note, or have had a belief based on circumstances known to him that there was a defense thereto, or the evidence must tend to prove that the purchase was made under such circumstances as indicate bad faith or a want of honesty on the part of the indorsee."

The district court, which had an opportunity to see and observe the witnesses, evidently accepted the testimony of the plaintiffs and decided this issue against the bank. This court is required to try the issues *de novo*, without reference to the findings of the trial court; but it is nevertheless the well-settled rule in Nebraska that, where the testimony of witnesses orally examined before the court is conflicting, so that both versions of the transaction cannot be true, this court will consider the fact that the trial court observed the witnesses and their manner of testifying, and must have accepted one version rather than the other. *Shafer v. Beatrice State Bank,* 99 Neb. 317; *Walton v. Porter,* 107 Neb. 264. It seems apparent that the trial court accepted the version of the plaintiffs and believed that the elder Deerk in the presence of the bank's president, before the purchase of the notes, made the statement that he felt there was something wrong with the deal and did not believe they had the land; that Albert would not say that Murphy should buy the notes, but left it to John; and John, on his part, gave consent, conditioned that the bank should see that the

deal was all right; and further believed that the bank, which knew the makers of these notes, believed in their honesty, knew that they had a large amount of machinery, and that they had theretofore been a patron and had paid their obligations, acted in bad faith when it purchased their paper from a holder who was willing to make a ruinous discount and accept but $500 in money, together with a more or less discredited real estate mortgage, as to the value of which it offered no proof, and the certificates of deposit mentioned. The attitude of the bank on the day following its purchase of the notes, when it assisted the plaintiffs in stopping payment on their check, but took no steps in protecting them against the portion of its unpaid purchase price, should have some bearing in determining its intention to deal fairly with the plaintiffs.

In view of the whole situation, we are unable to say that the bank has met the burden of proof required in order that it may be adjudged a holder in due course. The facts in the present case do not bring the parties within the rule asserted by the bank that, where a person gives his reasons for doing or not doing a certain thing involved in a transaction, he cannot, after litigation has been begun, change his ground and put his contention upon another and different consideration. The judgment of the district court is

AFFIRMED.